O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MICHELE L. OCHSNER,                )    Case No. SACV 12-0186 JPR
                                   )
              Plaintiff,           )    MEMORANDUM OPINION AND ORDER
                                   )    AFFIRMING THE COMMISSIONER
        v.                         )    AND DISMISSING ACTION
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of the Social         )
Security Administration,           )
                                   )
              Defendant.           )
_____)

I.   PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying her application for Social Security Disability Insurance
Benefits ("DIB").  The parties consented to the jurisdiction of
the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C.
§ 636(c).  The parties filed a Joint Stipulation on September 27,
2012, which the Court has taken under submission without oral
argument.  For the reasons stated below, the Commissioner's
decision is affirmed and this action is dismissed.

II.  BACKGROUND

     Plaintiff was born on January 12, 1965.  (Administrative
Record ("AR") 124.)  She earned a bachelor's degree in Health

1

Science and received certifications as a medical assistant and laser technician. (AR 71.) Before the onset of her alleged disability, on March 24, 2009, when she stopped working, Plaintiff worked for two and a half years as a coordinator at a wellness program and as a laser technician and medical assistant for over 10 years before that. (AR 71-73, 124, 134.)

On February 11, 2010, Plaintiff applied for DIB, alleging that she was unable to work because of sarcoidosis (systemic organ inflammation), fibromyalgia (chronic soft-tissue and joint pain), and depression. (AR 124-25; see id. at 181-82.) After Plaintiff's application was denied, she requested a hearing before an Administrative Law Judge ("ALJ"). (AR 99.) The ALJ held the hearing on April 21, 2011, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (AR 66-67.) On July 5, 2011, the ALJ found that Plaintiff was not disabled because she could perform her past relevant work. (AR 16-35.) On December 14, 2011, the Appeals Council denied Plaintiff's request for review. (AR 1-4.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the decision of the Commissioner to deny benefits. The Court may set aside the Commissioner's decision when the ALJ's findings were based on legal error or were not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996). "Substantial evidence is more than a scintilla, but less than a preponderance." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). It is "relevant evidence

which a reasonable person might accept as adequate to support a conclusion." Id.  To determine whether substantial evidence supported a finding, the court must "consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion." Aukland, 257 F.3d at 1035 (internal quotation marks omitted).  If the evidence could reasonably support either affirming or reversing that conclusion, a court may not substitute its judgment for that of the Commissioner, and the ALJ's decision must be upheld. Reddick, 157 F.3d at 720-21.

**IV.  DISABILITY EVALUATION**

Claimants are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a severe physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The Commissioner follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  § 404.1520(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the

3

claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made.  § 404.1520(a)(4)(ii). If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 404.1520(a)(4)(iii).  If the claimant's impairment does not meet an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, the claimant is not disabled. § 404.1520(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  § 404.1520(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  Id.; Lester, 81 F.3d at 828 n.5; Drouin,

---

[1]    RFC measures what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1   966 F.2d at 1257.

2        B.   The ALJ's Application of the Five-Step Process

3        At step one, the ALJ found that Plaintiff had not engaged in

4   any substantial gainful activity from the onset of her alleged

5   disability, March 24, 2009, through the time of the ALJ's adverse

6   decision, in July 2011. (AR 21.)  At step two, the ALJ found

7   that Plaintiff had severe impairments of mixed connective-tissue

8   disorder including sarcoid-like granulomas, lymphadenopathy

9   (inflammation of lymph nodes), sarcoidosis, and asthma.  (AR 21-

10  23.)  The ALJ concluded, however, that her alleged mental

11  impairment of depression was not severe, a finding Plaintiff does

12  not challenge.  (Id.)  At step three, the ALJ determined that

13  Plaintiff's impairments did not meet or equal any of the

14  impairments in the Listing.  (AR 23.)  At step four, the ALJ

15  found that Plaintiff retained the RFC to perform light work,[2]

16  limited by her (1) inability to perform above-shoulder activities

17  or work in an environment with excess airborne irritants, (2)

18  numbness in hands and feet, (3) nausea, and (4) "moderate" pain

19  in joints, muscles, head, shoulders, abdomen, and extremities.

20  (Id.)  The ALJ did not include Plaintiff's additional asserted

21  limitations of dizziness, hypothyroidism, fibromyalgia, fatigue,

22  and depression because he found them "slight" in nature.  (Id.)

23  The ALJ concluded that Plaintiff was capable of performing her

24  past relevant work as a medical assistant and the equivalent of

25

26        [2]   "Light work involves lifting no more than 20 pounds at a
    time with frequent lifting or carrying of objects weighing up to 10
27  pounds" and a "good deal of walking or standing" or sitting, "with
    some pushing and pulling of arm or leg controls."  20 C.F.R.
28  § 404.1567(b).

5

an esthetician and case manager.[3]  (AR 31.)  The ALJ determined

at step four that Plaintiff was not disabled and accordingly did

not reach step five.  (Id.)

**V.   DISCUSSION**

Plaintiff contends that the ALJ improperly (1) discounted

the opinion of her treating rheumatologist, Dr. Christine

Leehealey, by giving "little weight" to Dr. Leehealey's RFC

assessment (J. Stip. 5-12)[4] and (2) found that Plaintiff was not

credible as to the severity of her conditions and limitations

(id. at 14-19).

A.   Substantial Evidence Supported the ALJ's Rejection of

Dr. Leehealey's RFC Assessment

1.   Applicable law

Three types of physicians may offer opinions in social

security cases: "(1) those who treat the claimant (treating

physicians); (2) those who examine but do not treat the claimant

(examining physicians); and (3) those who neither examine nor

treat the claimant (non-examining physicians)."  Lester, 81 F.3d

at 830.  The opinions of treating physicians are generally

afforded more weight than those of nontreating physicians because

treating physicians are employed to cure and have a greater

opportunity to know and observe the claimant.  Smolen, 80 F.3d at

---

[3]    The VE testified that no positions existed in the Dictionary of Occupational Titles ("DOT") equivalent to Plaintiff's past work as a "laser technician" and "wellness program coordinator," and that the closest matches were an esthetician and case manager.  (AR 85-86.)

[4]    In addition to discounting Dr. Leehealey's RFC assessment, the ALJ gave little weight to her letters from August 2010 and March 2011 alleging that Plaintiff could not work.  (AR 30-31.)

1285.  The weight given a treating physician's opinion depends on
whether it was supported by sufficient medical data and was
consistent with other evidence in the record.  20 C.F.R.
§ 404.1527(c)(2).  If a treating physician's opinion was well
supported by medically acceptable clinical and laboratory
diagnostic techniques and was not inconsistent with other
substantial evidence from the record, it should be given
controlling weight and should be rejected only for "clear and
convincing" reasons.  Lester, 81 F.3d at 830; § 404.1527(c)(2).
When a treating physician's opinion conflicts with other medical
evidence or was not supported by clinical or laboratory findings,
the ALJ must provide only "specific and legitimate reasons" for
discounting that doctor's opinion.  Orn v. Astrue, 495 F.3d 625,
632 (9th Cir. 2007).  Factors relevant to the evaluation of a
treating physician's opinion include the "[l]ength of the
treatment relationship and the frequency of examination" as well
as the "[n]ature and extent of the treatment relationship."
§ 404.1527(c)(2)(i)-(ii).

        2.  Background

    Plaintiff had a history of abdominal pain, nausea, and
vomiting since 2007.  (AR 206.)  She improved slightly in 2008
but experienced significant abdominal and lower sternal pain in
March 2009, which resulted in two trips to the emergency room and
her stopping work.  (Id.)  Dr. Sheryl Long, her primary care
physician, referred her to specialists to ascertain the cause.
(AR 348, 353-54, 376.)  Plaintiff lost about 15 pounds between
March and April 2009 and was subsequently diagnosed with
lymphadenopathy in the thorax and abdomen by Drs. Syed Naqvi,

7

Colin Joyo, Winston Whitney, and Frederick Birnberg.  (AR 194-201, 206-09, 217, 222, 322, 437.)  Drs. Whitney and Birnberg, however, concluded in late 2009 that compared to Plaintiff's earlier chest scans, her lymph nodes had decreased in size and her mediastinal lymphadenopathy had normalized.[5]  (AR 217, 322.)  In particular, Dr. Whitney noted in September 2009 that there was "[n]o evidence of inflammatory stranding, free fluid, bowel wall thickening or significant lymphadenopathy elsewhere in the abdomen."  (AR 217.)  On October 5, 2009, Dr. David Kaufman conducted an esophagogastroduodenoscopy and found that Plaintiff's esophagus, stomach, and duodenum were "normal."  (AR 310.)

     As to Plaintiff's symptoms, Dr. Jennifer Grossman noted on August 26, 2009, that even though her weight loss had "stabilized," she (1) felt "nauseated all the time," (2) was weak and fatigued and could not get out of bed "to do more than walk to her mailbox each day," and (3) had difficulty running errands, shopping, doing chores, traveling by herself, and gripping and opening things.  (AR 221-24.)

     Plaintiff was referred to Dr. Leehealey, who subsequently diagnosed her with sarcoidosis.  (AR 225-27, 376, 655.)  In their initial meeting, on August 31, 2009, Dr. Leehealey noted that Plaintiff had severe abdominal pain and diagnosed her with arthralgias in "multiple sites" and "diffuse mediastinal and intraabdominal lymphadenopathy," which was "the pathology . . .

---

     [5]     Likewise, in August 2009, Dr. Leehealey noted that Plaintiff's lymphadenopathy had "decreased" under steroid treatment but that she still had severe abdominal pain.  (AR 562.)

most consistent with sarcoidosis." (AR 562-64.) Dr. Leehealey indicated that Plaintiff had been taking Prednisone since May but that the dosage had been reduced because of side effects. (AR 562.)

On September 24, 2009, Dr. Leehealey opined that Plaintiff likely had sarcoidosis and noted that she suffered from weight loss, low-grade fever, and abdominal pain. (AR 566.) Dr. Leehealey prescribed Methotrexate. (AR 567.)

On October 27, 2009, Plaintiff informed Dr. Leehealey that she had not improved and that the Methotrexate nauseated her. (AR 569-70.) Dr. Leehealey found that Plaintiff's "systemic symptoms [we]re worsening" and prescribed Remicade because it was "worth [a] try." (AR 571.)

On December 8, 2009, Dr. Leehealey noted mixed results: Plaintiff felt "overall a little better," including decreased stomach pain, but still had nausea, aching, and weakness. (AR 572.) Dr. Leehealey stated that some of Plaintiff's symptoms, such as her joint pain and arthralgias, were "to be expected as she tapered off Prednisone" and switched to Remicade. (AR 573.) Dr. Leehealey noted that Plaintiff was gaining "some weight back" and her gastrointestinal symptoms were "maybe slightly better." (Id.)

On February 9, 2010, Plaintiff complained that "everything" was severely painful and stiff, including her hands, wrists, forearms, legs, and muscles. (AR 575.) Dr. Leehealey found, however, that other than her joint and muscle pain, Plaintiff was "doing better in general on Remicade." (AR 577.)

On April 27, 2010, Dr. Leehealey noted that Remicade caused

nausea and headaches but was "helping" and that each dosage would remain effective for about six weeks.  (AR 578.)  Even though Plaintiff still had pain in her hands and feet, Dr. Leehealey noted that she had gained a few pounds and continued to improve on "many of her [gastrointestinal] symptoms."  (AR 578-80.)  Dr. Leehealey found, however, that Plaintiff's arthralgias and myalgias had worsened and suspected fibromyalgia based on Plaintiff having 14 of 18 tender points.[6]  (AR 579-80.)

On June 29, 2010, Dr. Leehealey observed that Plaintiff continued to gain weight (eight pounds) and her stomach pain had improved, although she was still "woozy and fatigued and nauseated."  (AR 661.)  Dr. Leehealey found that Plaintiff still suffered from "significant" arthralgias and fibromyalgia and had 18 of 18 tender points; Dr. Leehealey proscribed Plaquenil for treatment.  (AR 661-63.)

On August 24, 2010, Dr. Leehealey noted that after taking Plaquenil, Plaintiff felt at least "20% better" and not as "stiff and achy," though she still had pain in her left ankle and foot.  (AR 659.)  Dr. Leehealey found Plaintiff to be "stable on [Plaquenil] and [Methotrexate]" and noted "tender points 12 out of 18 improved" and that her fibromyalgia was "slightly better with the improved arthralgias."  (AR 660.)

On November 16, 2010, Dr. Leehealey noted that although Plaintiff still had nausea and headaches, she appeared to have "more energy."  (AR 656.)  Further, Dr. Leehealey found Plaintiff

---

[6]    The "rule of thumb" for diagnosing fibromyalgia is that one must have at least 11 of 18 tender points.  Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001).

to be "stable on her current med[ication]s" and her pain "somewhat controlled such that she [wa]s able to do other things now during the day such as taking classes." (AR 657.) Dr. Leehealey also noted that Plaintiff no longer took her pain medication (Darvocet) every day, even though it was supposed to be taken three times a day. (AR 656.) Dr. Leehealey found "tender points 12 out of 18 improved." (AR 657.) Dr. Leehealey scheduled the next appointment in four months or "as needed." (Id.)

Dr. Leehealey filled out an RFC assessment form on February 1, 2011. (AR 763.) She described Plaintiff as having sarcoidosis and fibromyalgia with a fair-to-poor prognosis, supported in part by her prior finding of 18 of 18 tender points. (Id.) She noted that Plaintiff had symptoms of joint pain and stiffness, muscle and soft-tissue pain, numbness, nausea, vomiting, weight loss, and severe fatigue. (AR 764-65.) She indicated that Plaintiff (1) had pain ranking nine of 10 in severity and fatigue ranking 10 of 10; (2) could sit for only two hours and stand and walk for zero to one hour during a regular work day; (3) could occasionally lift and carry five to 10 pounds; and (4) had "significant" limitations in doing repetitive reaching, handling, fingering, and lifting because of her joint pain and numbness and "marked" limitations in using her upper extremities. (AR 765-67.) In addition, Dr. Leehealey concluded that Plaintiff's pain and fatigue constantly interfered with her attention and concentration and that she was incapable of working

1    even in a low-stress environment.[7]  (AR 768.)

2         On March 15, 2011, in her final treatment note on record,

3    Dr. Leehealey found a major flare-up of symptoms, including

4    increased nausea, joint pain, and fatigue, but attributed

5    Plaintiff's worsening conditions to her temporary interruption in

6    medication to fight off a two-week-long infection.  (AR 794.)

7    Dr. Leehealey noted that Plaintiff had been off Methotrexate for

8    four weeks and had resumed taking it and Plaquenil only since

9    "the past week."  (Id.)  Noting that Plaintiff was "worse off"

10   without those medications, Dr. Leehealey found 18 of 18 tender

11   points, "a lot of arthralgias," and "debilitating pain."  (AR

12   794-96.)

13        Dr. Leehealey documented Plaintiff's weight during each

14   visit: 141 pounds on August 31, 2009 (AR 563); 136 pounds on

15   September 24, 2009 (AR 566); 135 pounds on October 27, 2009 (AR

16   569); 137 pounds on December 8, 2009 (AR 572); 137 pounds on

17   February 9, 2010 (AR 575); 140 pounds on April 27, 2010 (AR 578);

18   144 pounds on June 29, 2010 (AR 661); 140 pounds on August 24,

19   2010 (AR 659); and 142 pounds on November 16, 2010 (AR 656).[8]

20        In contrast to Dr. Leehealey's RFC assessment finding

21   Plaintiff incapable of performing even sedentary work, two

22   doctors from the Department of Social Services ("DSS") evaluated

23   Plaintiff and found that she was capable of light work.  (AR 604,

24

25        [7]   Notably, Dr. Leehealey's RFC assessment prohibited
     Plaintiff from performing even sedentary work, which involves
26   lifting no more than 10 pounds at a time and primarily sitting with
     occasional standing and walking.  See 20 C.F.R. § 404.1567(a).
27

28        [8]   Dr. Leehealey's March 15, 2011 report does not indicate
     Plaintiff's weight.  (AR 794-96.)

624.)  On June 18, 2010, Dr. John Godes conducted a physical
examination of Plaintiff based on her complaints of joint pain,
headaches, abdominal pain, nausea, and fatigue.  (AR 604.)  Dr.
Godes diagnosed her with mixed connective-tissue disorder
including sarcoid-like granulomas but concluded that she could
lift 20 pounds occasionally and 10 pounds frequently and was able
to stand or walk for six hours in a workday and to sit for six
hours of the day as well.  (AR 609.)  On June 29, 2010, Dr. B.
Harris, a medical consultant, concurred with Dr. Godes's finding
that Plaintiff was capable of light work.  (AR 624-27.)

In addition, Dr. Lorna Carlin from DSS indicated the
following regarding Plaintiff's daily activities based on a
psychiatric evaluation on June 24, 2010:

> [Plaintiff] currently lives with a cousin and his
> family in a house, . . .  She takes care of self-
> dressing, self-bathing and personal hygiene.  For
> transportation, [Plaintiff] drives a car.  Her outside
> activities are going to church.  She visits her son and
> goes daily to play with her dog, who is staying at her
> ex-husband's house, which is only about two miles from
> where she lives.  She says that she sometimes goes to
> restaurants to get take out food.  Her hobby is making
> jewelry and reading.  She is able to pay bills and handle
> cash appropriately.  She is able to go out alone.
> Relationships with family and friends are good.  She is
> able to focus attention during the interview.  She
> reports that she does not do a lot of household chores.
> She keeps up her room and does her own laundry.  She can

13

prepare food for herself and can run errands. [Plaintiff] has no difficulty making decisions.

On a daily basis, [Plaintiff] says she gets up late in the morning, she may watch television for a couple of hours and take a shower and then she gets something to eat. Sometimes she will go to a restaurant and get a take-out salad and then she will go to her ex-husband's house and play with her dog. She will then come home and watch television. She does go on the computer at times.

(AR 614, 616-17.)

3. ALJ's findings

The ALJ noted that Dr. Leehealey began treating Plaintiff in August 2009 and subsequently diagnosed her with sarcoidosis. (AR 28.) The ALJ gave "little weight" to Dr. Leehealey's February 2011 RFC assessment, however, because it was "too restrictive" and "not based on objective evidence." (AR 30.) The ALJ contrasted Dr. Leehealey's conclusions underlying the RFC assessment, including that Plaintiff had "18 of 18 tender points" and lost weight, with Dr. Leehealey's previous treatment notes showing that Plaintiff had in fact improved. For instance, Dr. Leehealey's August 24, 2010 note indicated that Plaintiff was "doing better" with medications and her fibromyalgia was "slightly better with the improved arthralgias." (AR 28-29.) Further, Dr. Leehealey observed on November 16, 2010, that in spite of nausea and headaches, Plaintiff had only "12 of 18" tender points and "more energy," her pain was "somewhat controlled," and she could "do other things . . . during the day." (AR 29.) The ALJ considered Dr. Leehealey's March 2011

14

report indicating increased pain, nausea, and fatigue but reasoned that Plaintiff's conditions worsened at the time only because she had stopped taking her medications in order to fight off an infection.  (Id.)  The ALJ also disagreed with Dr. Leehealey's conclusion that Plaintiff continued to lose weight, noting that her weight had "no significant changes and remained relatively stable" in 2010 and 2011.  (AR 30.)  The ALJ therefore rejected Dr. Leehealey's RFC assessment.  (Id.)  The ALJ credited instead the RFC assessment from Drs. Godes and Harris, finding that Plaintiff was capable of performing light work.  (AR 31.)

### 4.  Analysis

Substantial evidence supported the ALJ's specific and legitimate reasons for rejecting Dr. Leehealey's February 2011 RFC assessment as embellishing Plaintiff's symptoms.  As the ALJ found, Dr. Leehealey's RFC assessment contradicted her previous treatment notes and other objective medical evidence showing that Plaintiff had improved with medication.  In particular, when Dr. Leehealey began treating Plaintiff in August 2009, she suffered from autoimmune diseases such as sarcoidosis and lymphadenopathy, which caused severe abdominal pain, and arthralgias, which caused joint and muscle pain.  (AR 562-64.)  Dr. Leehealey noted in October 2009 that Plaintiff's overall condition was "worsening." (AR 571.)  After that visit, however, Dr. Leehealey's subsequent medical notes show that Plaintiff gradually began improving, particularly in terms of her abdominal pain and gastrointestinal problems.  (See AR 571-73 (observing that Plaintiff's stomach pain improved and gastrointestinal problems were "slightly better"); AR 577-80 (noting that Plaintiff's gastrointestinal

15

problems continued to improve).)

Likewise, objective medical evidence corroborates Dr. Leehealey's conclusion that Plaintiff's intestinal pain and inflammation subsided in late 2009: (1) Dr. Birnberg found in August 2009 that compared to Plaintiff's earlier scans, her lymph nodes had decreased in size and her mediastinal lymphadenopathy had normalized (AR 322); (2) Dr. Whitney found in September 2009 that there was no evidence of significant lymphadenopathy in the abdomen (AR 217); and (3) Dr. Kaufman observed in October 2009 that Plaintiff's esophagus, stomach, and duodenum appeared normal (AR 310).

Unlike her intestinal problems, Plaintiff's joint and muscle pain worsened in 2010, culminating in Dr. Leehealey's diagnosis of fibromyalgia in April 2010 and her finding of 18 of 18 tender points in June 2010. (AR 578-80, 661-63.) After Dr. Leehealey proscribed Plaquenil on August 24, 2010, however, Plaintiff's joint and muscle pain improved and her overall condition appears to have stabilized. (AR 659-63.) Indeed, Dr. Leehealey's medical note on November 16, 2010, which was based on her last examination of Plaintiff before her February 2011 RFC assessment, shows that Plaintiff's pain was under control, evidenced by her not having to take her pain medication every day, and that she had "more energy," was taking a class, and was "stable" on her current medications. (AR 656-57.) Finally, Dr. Leehealey noted in all visits that Plaintiff's muscle strength was "5/5," indicating that she had no underlying physical limitations outside of her autoimmune symptoms. (See, e.g., AR 660.)

Dr. Leehealey's documentation of Plaintiff's weight also

coincides with her treatment notes showing that Plaintiff
responded to medication and began to improve: Plaintiff dropped
to her lowest weight, 135 pounds, on October 27, 2009, but
gradually regained it in subsequent visits.  (See AR 569, 572,
575, 578, 656, 659, 661.)  In fact, Plaintiff's final documented
weight of 142 pounds on November 16, 2010, was higher than her
weight of 141 pounds when she initially saw Dr. Leehealey on
August 31, 2009.  (AR 562, 656.)

        Thus, substantial evidence supported the ALJ's rejection of
Dr. Leehealey's February 2011 RFC assessment alleging – in direct
contrast with her past treatment notes – that Plaintiff was
limited to less than sedentary work and suffered debilitating
symptoms from sarcoidosis and fibromyalgia, including extreme
pain and fatigue and ongoing weight loss.  See Rollins v.
Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (holding that ALJ
did not err in rejecting various statements by treating physician
because they were internally inconsistent and unsupported by any
objective medical evidence, including findings from same
physician).  Even though Dr. Leehealey's March 2011 treatment
note indicates that Plaintiff suffered a major flare-up in
symptoms, the ALJ properly discounted it because (1) the RFC form
preceded Plaintiff's March 2011 visit with Dr. Leehealey and
therefore could not possibly have accounted for Plaintiff's
prospective adverse symptoms and (2) in any event, her conditions
worsened because she had not been taking Plaquenil and
Methotrexate, which had proved to be effective.  Plaintiff's
contentions that the ALJ ignored Dr. Leehealey's March 2011 note
and placed undue emphasis on her previous treatment notes

therefore fail.  (See J. Stip. 10-11.)   The ALJ therefore was
justified in relying on the RFC assessment from Drs. Godes and
Harris and finding that Plaintiff was capable of performing light
work in spite of her conditions.  (AR 604, 609, 624-27.)   This
Court cannot reverse simply because the medical evidence of
record might have supported another interpretation more favorable
to Plaintiff.  See Reddick, 157 F.3d at 720-21; Ryan v. Comm'r of
Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (holding that if
"evidence is susceptible to more than one rational
interpretation, the ALJ's decision should be upheld" (internal
quotation marks omitted)).  Accordingly, reversal is not
warranted on this claim.

  B.   Substantial Evidence Supported the ALJ's Adverse
       Credibility Determination

       1.   Applicable law

An ALJ's assessment of credibility is entitled to "great
weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989).
When the ALJ finds a claimant's subjective complaints not
credible, the ALJ must make specific findings that support the
conclusion.  Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir.
1991) (en banc); Varney v. Sec'y of Health & Human Servs., 846
F.2d 581, 584 (9th Cir.), modified on reh'g, 859 F.2d 1396 (9th
Cir. 1988).  Absent affirmative evidence of malingering, the ALJ
must give "clear and convincing" reasons for rejecting the
claimant's testimony.  Lester, 81 F.3d at 834.  As long as the
ultimate credibility finding was supported by substantial
evidence in the record, the ALJ's decision must be upheld, even
if he relied on some improper reasons in support of the finding.

18

<u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1162–63
(9th Cir. 2008).   If the ALJ's credibility finding was supported
by substantial evidence, the reviewing court "may not engage in
second-guessing."   <u>Thomas v. Barnhart</u>, 278 F.3d 947, 959 (9th
Cir. 2002).

### 2.   <u>Background</u>

Plaintiff testified at the April 2011 hearing that despite
medications that "help[ed]," she had pain "everywhere,"
particularly in her arms, wrists, hands, legs, feet, and ankles;
she also had numbness in her hands and feet.   (AR 74-76.)   She
was fatigued "[a]ll the time," and her weekly intake of
Methotrexate nauseated her.   (AR 75, 79-80.)   She had headaches
every day, which lasted "[t]he majority of the day."   (AR 80.)
Finally, she suffered from depression, with symptoms of
"[s]adness" and not feeling "worthwhile."   (AR 76.)

As a result, Plaintiff did not "do very much" during the day
except watch television.   (<u>Id.</u>)   She used the computer to browse
the internet but could not "use it for very long."   (AR 76-77.)
The last time she had driven before the hearing was "a couple
days ago."   (AR 77.)

### 3.   <u>ALJ's findings</u>

In denying her claim, the ALJ found that Plaintiff's
"statements concerning the intensity, persistence and limiting
effects of [her] symptoms [we]re not credible to the extent they
[we]re inconsistent with" the ALJ's finding that she retained the
RFC to perform light work.   (AR 23-24.)   In particular, the ALJ
found that Plaintiff's allegations about the extent and disabling
effects of nausea, abdominal pain, headaches, muscle and joint

pain, fatigue, weakness, fibromyalgia, and depression conflicted with the objective medical evidence and her daily activities. (AR 29.)

The ALJ cited the medical reports of Drs. Long, Whitney, Kaufman, and Leehealey in rejecting Plaintiff's testimony.   In early 2010, Dr. Long found that (1) Plaintiff's depression improved "markedly" on Cymbalta and she was "feeling better"; (2) most of Plaintiff's chronic problems – including her asthma, reflux esophagitis, and hypothyroidism – were "stable"; (3) her lower back pain was "satisfactorily self managing" with "well controlled or resolved symptoms"; (4) her lymphadenopathy became normalized; (5) she had no abdominal pain, weight loss, or anxiety; and (6) she was "managing demands of home and work[9] [and] play." (Id.)   In September 2009, Dr. Whitney found a decrease in the size of Plaintiff's lymph nodes and no evidence of inflammatory stranding, free fluid, bowel-wall thickening, or significant lymphadenopathy elsewhere in the abdomen. (Id.)   Dr. Kaufman found in October 2009 that Plaintiff's esophagus, stomach, and duodenum appeared normal. (AR 29-30.)   Finally, Dr. Leehealey's more recent reports showed that Plaintiff had improved overall and become stable with medications, including having more energy and gaining weight. (AR 30.)

The ALJ also noted that Plaintiff's subjective complaints contradicted her documented activities, such as self-grooming, maintaining hygiene, driving, eating out, attending church,

---

[9]   Plaintiff was apparently no longer working in early 2010, so the reference to "work" was likely either a mistake or simply, in context, a colloquialism.

visiting her son, playing daily with her dog at her ex-husband's house, paying bills, handling cash, doing laundry, preparing food, and running errands.  (Id.)  The ALJ therefore found Plaintiff's contrary testimony not credible.  (Id.)

### 4.  Analysis

Substantial evidence supported the ALJ's adverse credibility determination.  As explained above, objective medical evidence, including reports from Drs. Long and Leehealey, showed that based on treatment and medication, Plaintiff's abdominal pain and inflammation improved in late 2009 and her joint and muscle pain stabilized around 2010.  Even though Dr. Leehealey's March 2011 report indicates a flare-up of adverse symptoms because Plaintiff temporarily stopped taking Plaquenil and Methotrexate, those symptoms presumably subsided after she resumed taking the necessary medications.  Further, Plaintiff's assertion that she was fatigued "[a]ll the time" was contradicted by Dr. Long's observation in January 2010 that her fatigue "waxe[d] and wane[d] with her autoimmune condition," which had improved under Dr. Leehealey's care.  (AR 536.)

In addition, Plaintiff overstated the effect of her depression.  The record shows that even though Plaintiff had suffered from depression since 1990, which worsened in 2009 because her Prozac prescription had become "less effi[ca]cious . . . over time" and she experienced increased stress with work, her financial condition, and her divorce (AR 353), her depression "markedly improved" after she started taking Cymbalta in December 2009 (AR 534, 536, 542).  In fact, Dr. Long noted in February 2010 that as to her depression, the "therape[]utic goal" had been

"achieved" and Plaintiff experienced "no side effects" from taking Cymbalta and Wellbutrin.  (AR 542.)  Further, two doctors from DSS corroborated Dr. Long's conclusions: (1) Dr. Carlin found in June 2010 that Plaintiff suffered from depression but had "moderate" psychosocial stressors and a global assessment of functioning ("GAF") score of 70, which was also moderate[10] (AR 614, 619); and (2) Dr. R. Tashjian found in July 2010 that Plaintiff suffered from depression, but the degree of limitation on her daily activities and maintaining social functioning or concentration was "mild" (AR 633-35, 641).  Moreover, other than Dr. Long and to an extent the DSS doctors, Plaintiff did not seek medical help to treat her depression after March 24, 2009, her alleged disability onset date (see AR 615 (Dr. Carlin noting that Plaintiff had "never been hospitalized in a psychiatric hospital," "never received outpatient psychiatric treatment other than in 2006," and was not seeing any mental health professional at the time)); the ALJ therefore properly considered that factor in finding her not credible, see Bunnell, 947 F.2d at 346 (holding that in assessing credibility, ALJ may properly rely on plaintiff's unexplained failure to request treatment consistent with alleged severity of symptoms).

Moreover, as the ALJ noted, Plaintiff's alleged limitations were inconsistent with her documented activities, which in June 2010 consisted of taking care of personal hygiene and bathing, driving by herself to visit her son and play with her dog,

---

[10]   A score between 61 to 70 on the GAF scale indicates some mild symptoms or difficulty in social, occupational, or school functioning.

22

attending church, getting take-out from restaurants, making jewelry, reading, and paying her bills.  (AR 616-17.)  Plaintiff could also handle household chores such as maintaining her room, doing laundry, preparing food, and running errands.  (Id.)  The ALJ therefore properly considered the inconsistencies between Plaintiff's testimony and her documented activities in finding her not credible.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1196-97 (9th Cir. 2004) (adverse credibility determination supported in part by conflict between claimant's allegation and documented activities).

Accordingly, the ALJ's adverse credibility determination regarding the severity of Plaintiff's impairments and limitations was supported by substantial evidence, and reversal is not warranted on this claim.

**VI.  CONCLUSION**

Consistent with the foregoing and pursuant to sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 16, 2012

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[11]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."